# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-23-00081-CR

---

**Walker Kaatz, Appellant**

**v.**

**The State of Texas, Appellee**

---

**FROM THE 450TH DISTRICT COURT OF TRAVIS COUNTY**
**NO. D-1-DC-20-301361, THE HONORABLE BRAD URRUTIA, JUDGE PRESIDING**

---

## M E M O R A N D U M   O P I N I O N

Following the denial of his pretrial motion to suppress and motion for an evidentiary hearing under *Franks v. Delaware*, 438 U.S. 154, 171–72 (1978), appellant Walker Kaatz pleaded guilty pursuant to a plea bargain to tampering with a human corpse with the intent to impair its availability as evidence, *see* Tex. Penal Code § 37.09(c), (d)(1). In accordance with the bargain's terms, the trial court sentenced Kaatz to three years' confinement. In two issues on appeal, Kaatz contends that the trial court abused its discretion by denying the motions. We affirm the trial court's judgment of conviction.

# BACKGROUND[1]

At approximately 8:42 p.m. on August 18, 2020, a woman[2] called 911 to report that she had visited a friend, Kristie Cardenas, earlier that day and that Cardenas had showed her where Cardenas's ex-boyfriend, who the caller knew as "Nicklas," was buried in the backyard. Officers later identified the decedent as Nicklas Kinslow. According to the caller, Cardenas told her "exactly what happened, like a story," and escorted her into the backyard, where the caller observed a shed, cement, and cinderblocks arranged in "a perfect rectangle." Cardenas stated, "He's right here," and when the caller sought clarification, added, "Nick." The caller noticed that "they[ had] already started putting cement over him . . . [and had] burned his stuff." Although the caller noted that Kinslow "got [Cardenas] hooked on meth" and that the caller had wondered whether she was high, the caller related that Cardenas "seemed normal," that she "just couldn't stop talking about it," and that the caller did not know how people act under the influence of methamphetamine.

The caller reported that a big young man with glasses—whom police later determined to be Kaatz—lived in the house, which had belonged to his deceased mother. Kaatz reportedly told the caller that Kinslow had threatened to hang and "gut" him. Although the caller did not remember "if [Cardenas] did it or [Kaatz] did it or who," she informed the operator that Kinslow had been killed two or three days before her visit and that Kaatz had also told the caller that "it happened during the day"; that "people saw them out in the backyard"; and that "[t]here[ were] still drag marks, and [they had] already bleached it." The caller provided the operator with

---

[1] The facts provided are taken from the testimony and exhibits admitted at the hearing on Kaatz's suppression motion.

[2] The woman gave her name and contact information to law enforcement but requested that officers "leave [her] name out of it."

a detailed description of the house's layout and specified the room in which the murder had occurred.

The caller explained that Kinslow had "beaten" Cardenas and "almost killed her several times," that Cardenas had attempted to obtain a protective order against him, and that he "used to shoot . . . at [Cardenas]" and once "shot up [her] whole car." Although the caller did not know whether there were guns in Kaatz's house, she noted that Kinslow "used to have a lot of guns."

Officers from the Austin Police Department (APD) responded to Kaatz's house the same night. On arriving, Officer Marisa Giglio instructed Officer Christopher Allen to call the 911 caller for additional information and to get "some feeling as to [the caller's] credibility." In her conversation with Officer Allen, the caller reiterated much of what she had said previously and provided several new details. She stated that Kaatz and Kinslow had been friends; that Cardenas had told the caller that Cardenas and Kaatz paid Kinslow's $10,000 bond; and that once at Kaatz's house, Kinslow had "just started beating [Cardenas] up again." The caller cautioned that "this may have a very ugly domestic violence type thing." She described the backyard at length, reporting that it was surrounded by a privacy fence; was accessible through a messy carport; and contained cinderblocks, empty bags of cement, and the "little rectangular pit," which was right next to the shed. She characterized the pit as hastily constructed and partially filled with cement "shaped like if it's poured over a body." She told Officer Allen that Kaatz "said he wrapped [Kinslow] in a tarp" and that "something was burned on top of him."

After reaching out to other law enforcement agencies, Officer Giglio learned that Kinslow had been arrested several times, was the subject of an active emergency protective order in favor of Cardenas, had two outstanding arrest warrants for aggravated assault with a deadly

3

weapon allegedly committed against her, was affiliated with the Aryan Brotherhood, and was a known drug user. Cardenas's Facebook page indicated that she was in a relationship with Kinslow. Officers conducted a welfare check at Kinslow's residence, but he was not there. His father told police that he had not spoken with Kinslow in a few days and that he believed Kinslow may have cut off his GPS monitor and fled to Mexico. Officer Giglio testified at the suppression hearing that she "had some concern as to officer safety and certainly would have been concerned if Mr. Kinslow had been alive [and on] the premises."

APD officers formed two "hasty react teams" (HRT), one to monitor the front of Kaatz's house and the other to monitor the back. Officer Giglio testified that a helicopter performed a flyover and, using infrared radar, located in Kaatz's backyard a "rectangular shape near the shed," which "appear[ed] to be giving off a little heat."

At approximately 12:45 a.m. on August 19, Kaatz's rear neighbor allowed the back HRT to access the neighbor's backyard. Armed officers placed a ladder against the neighbor's fence and surveilled Kaatz's backyard, in part, according to Officer Giglio's testimony, to ensure that the front HRT did not "have to worry about anybody being in the backyard" and that "nobody came out if [officers] approached the front of the house." A member of the back HRT stated that while the "[b]ackyard seem[ed] clear" and while he had "a good view," he "[could not] see shit," including in "some type of opening." When asked if he could "see any of the items we're looking for in [Kaatz's] backyard," the officer responded, "It's dark. I don't want to shine my light unless you are okay with it." At approximately 1:09 a.m., the officer was given permission to "illuminate the rear" and activated his flashlight.

In Kaatz's backyard, members of the back HRT observed "cement and a brick like freshly laid next to the barn or next to the shed," bags of "quick cement," a dolly, and a

4

cinderblock structure that appeared to have been "just created." Officers referred to the structure as "a body-type like [the 911 caller] described" and "like a little coffin." At approximately 1:15 a.m., an officer with the back HRT remarked that the front HRT was "clearing [the backyard] with guns." At approximately 1:16 a.m., she stated, "The only thing they have to clear is that barn thingy. But the barn I think is locked."

Around 1 a.m., Detective Paul Chavez knocked on Kaatz's front door. Kaatz and Cardenas exited the house and were interviewed by Corporal Michael Jones and Detective Chavez, respectively. Kaatz, who exited first, stated that he and Cardenas were the house's only occupants and that the house belonged to him. At approximately 1:07 a.m., while waiting for Cardenas to come outside, Detective Chavez directed officers to "debrief" Kaatz in front of his neighbor's house. Cardenas exited the house approximately a minute later.

When told that officers knew what happened to Kinslow, Cardenas at first asked, "What happened with Nicklas," before stating, "I don't – I – he's gone, like he's on the run." During her interview with Detective Chavez, which was recorded by his body camera, Cardenas's demeanor was erratic and shifted frequently. At one point, she gasped and took a step backward, seemingly unprompted. Elsewhere, she appeared to move quickly from laughter to sadness. She explained that she convinced Kaatz to "help get [Kinslow] out of jail"; that after being released, Kinslow was "violent" with her; that "[t]here's another girl"; that Kinslow "wrote a letter to [Cardenas saying that] he was leaving, which he's been telling since he got out"; and that "all he always said [was that] he was going to go to Mexico." Cardenas insisted that she had not told anyone anything but replied, "Not that I remember," when asked if someone had visited her "earlier today." She stated that she could not remember how long it had been since she had

5

last seen Kinslow but that it was "when [she] pulled the bond." Asked whether it was "a week? Two weeks? Three weeks," she responded, "A little bit."

Like Cardenas, Kaatz denied knowing why officers were at his house. When told that they had received a 911 call alleging that Kinslow had been killed and buried in his backyard, Kaatz replied only, "Oh, okay." Kaatz stated that Kinslow was one of his best friends, that he had paid $10,000 to get Kinslow out of jail because they were supposed to work a construction job together, that Kinslow had lived at his house for a couple of days and had been abusive toward Cardenas, and that he had not spoken with Kinslow in two or three weeks. Kaatz expressed frustration that police had failed to act when they were called to his house two weeks earlier, following an assault by Kinslow against Cardenas. Kaatz stated that Kinslow did not have a car or job, that he was addicted to meth, and that Kaatz must have been sleeping when people brought meth to Kinslow at night. Kaatz denied doing work on his yard recently. At approximately 1:10 a.m., Corporal Jones asked Kaatz if officers could "go look inside the house, make sure nobody else is in there," and Kaatz responded, "Yeah. It's fine."

The front HRT began a protective sweep of Kaatz's house at approximately 1:11 a.m. Officer Giglio testified that police "weren't searching for anything [but . . .] were just looking to make sure there were no people inside." After sweeping the house's interior, officers exited a side door in the kitchen at approximately 1:14 a.m.; emerged into the carport, which Officer Giglio testified was "cluttered"; and began sweeping the backyard with guns drawn at approximately 1:15 a.m. Officer Giglio testified that officers were not "searching for evidence back there," that the plan was "to be armed and just be prepared for anything," that it would have been "negligent to stop at th[e] gate," that officers are taught to sweep the yard and always do so when sweeping a house, and that "[i]t's safety[; y]ou have no idea who's in the backyard." She

6

also testified that the yard was "fairly big" and that the shed was more than 100 feet from the carport.

Corporal Jones's and Detective Chavez's suppression-hearing testimony supported Officer Giglio's explanation for the sweep's scope. Corporal Jones testified that a protective sweep, which he referred to as a "confederate sweep," extends to "more or less any part of the premises where an individual could be hiding that could attack [officers] while [they were] conducting a more long-term investigation." He testified that officers "needed to clear the structures" in the yard to follow "policies and training" because "there[ was] either a potential fugitive that's known to have guns, or there[ was] potentially a body buried in the back[]yard," and because the boat and shed were "potential places for an assailant to hide." Detective Chavez likewise testified that because of the shed, truck, and boat being in the backyard, it was "prudent for APD at this point to do a protective sweep of the entire area to make sure officer safety is [the] number one priority."

Officer Giglio testified that as she walked into the backyard, she saw "some cinder[]blocks[, . . .] some loose and some in a rectangular shape" with plyboard on top of them. During the sweep, Corporal Jones remarked that the shed was locked and noted a smell by the cinderblock structure, which Officer Giglio stated she could also smell. She later testified that she had smelled "the odor of a decomposing body." Less than a minute elapsed between officers' entering the backyard and their gathering near the cinderblock structure.

At approximately 1:16 a.m., Detective Chavez entered the backyard, and Corporal Jones asked if officers had cleared the boat. An officer replied, "No, we haven't," and members of the front HRT illuminated the boat with their flashlights. Detective Chavez asked if Kaatz had given permission for the front HRT "to be back [t]here." An officer answered, "He

did not," and Corporal Jones explained that they had been given "permission to check the house for anything." Detective Chavez then asked whether the officers had "consent to check for anything," to which members of the HRT responded, "We just said check the house," and, "Make sure nobody's injured or anything." Detective Chavez instructed Corporal Jones to request Kaatz's written consent to search the backyard. At approximately 1:18 a.m., Corporal Jones stated, "Good on confederate part," which he testified during the suppression hearing meant that the protective sweep was completed. Detective Chavez also testified that the sweep finished at 1:18 a.m.

Corporal Jones returned with a signed consent form at approximately 1:25 a.m. During the intervening period and prior to Kaatz's giving consent, Detective Chavez and Officer Giglio searched the backyard using flashlights. The officers disagreed about whether the odor came from the shed or the cinderblock structure, and Detective Chavez took photographs of the structure, spoke with his sergeant on the phone, and noticed that the cinderblocks were "fused" together and that someone had attempted to dig holes nearby. He remarked that the structure resembled "a makeshift type of grave." Officer Giglio testified that she had gone as far as the holes during the sweep but "was only looking for people."

After obtaining Kaatz's consent to search the backyard, Detective Chavez removed the plyboard that had been placed over the cinderblock structure and on top of which more cinderblocks had been set. Inside the structure was poured cement consistent with the shape of a human body. Burn marks and maggots were discovered on top of the cement, and Officer Giglio noted a bottle of lighter fluid next to the cinderblocks.[3] Detective Chavez testified

---

[3] Although it appeared that the bottle of lighter fluid was in plain view, it is unclear from the record whether it was noticed by officers before or during the protective sweep.

8

that after observing the cement mound, police "ended up backing out," and he returned to the police station and began a search warrant application. A magistrate issued the search warrant at 9:54 a.m. on August 19.

Kaatz filed a pretrial motion to suppress "all evidence obtained by members of law enforcement," asserting in relevant part that the protective sweep had been unconstitutionally excessive in scope and duration and that officers had lacked consent to search his backyard. The trial court held a hearing on the motion and denied it without making findings of fact or conclusions of law. Kaatz next filed a motion for a *Franks* hearing and alleged that Detective Chavez's probable cause affidavit had contained "false statements and material omissions." The trial court denied the motion without a hearing. Following the court's denial of his motions, Kaatz pleaded guilty to tampering with a human corpse and was sentenced to three years' confinement. This appeal followed.

## STANDARD OF REVIEW

"We review a trial court's ruling on a motion to suppress using a bifurcated standard for an abuse of discretion." *State v. Espinosa*, 666 S.W.3d 659, 667 (Tex. Crim. App. 2023). "We afford almost total deference to a trial court's determination of historical facts if supported by the record, especially when the factfinding is based on an evaluation of credibility and demeanor." *Monjaras v. State*, 664 S.W.3d 921, 926 (Tex. Crim. App. 2022). On the other hand, "[w]e review de novo legal questions and mixed questions that do not turn on credibility and demeanor, such as facts of a case that would establish probable cause." *Espinosa*, 666 S.W.3d at 667 (citing *State v. Ross*, 32 S.W.3d 853, 856 (Tex. Crim. App. 2000)). When, as here,

9

a trial judge does not enter findings of fact when denying a motion to suppress, a reviewing court must view the evidence "in the light most favorable to the trial court's ruling" and "assume that the trial court made implicit findings of fact that support its ruling as long as those findings are supported by the record."

*Harrison v. State*, 205 S.W.3d 549, 552 (Tex. Crim. App. 2006) (quoting *Ross*, 32 S.W.3d at 855). "The evidence and all reasonable inferences are viewed in the light most favorable to the trial court's ruling, and the trial court's ruling must be upheld if it is reasonably supported by the record and is correct under a theory of law applicable to the case." *Espinosa*, 666 S.W.3d at 667.

## DISCUSSION

### I. Protective Sweep

In his first issue, Kaatz contends that the trial court abused its discretion by denying his motion to suppress because "the police made an illegal protective sweep of [his] backyard." Citing the Fifth Circuit Court of Appeals' decision in *United States v. Gould*, which listed five "requirements for a valid in-home protective sweep," he argues that two of the requirements were not satisfied in this case, namely, that the protective sweep cannot be more than a "cursory inspection" and that it may last "no longer than is necessary to dispel the reasonable suspicion of danger." 364 F.3d 578, 586–87 (5th Cir. 2004) (en banc), *abrogated on other grounds by Kentucky v. King*, 563 U.S. 452, 464 (2011) (citing *Maryland v. Buie*, 494 U.S. 325, 333–37 (1990)). He asserts that because officers' observations during the protective sweep "were the basis for everything that occurred thereafter"—including their obtaining his written consent to search the backyard and applying for a search warrant—"everything obtained as a result of the illegal entry to [his] backyard must be suppressed" under Texas's exclusionary rule, article 38.23(a) of the Texas Code of Criminal Procedure. *See* Tex.

10

Code Crim. Proc. art. 38.23(a) (providing that illegally obtained evidence may not be "admitted in evidence against the accused on the trial of any criminal case").

The ultimate touchstone of the Fourth Amendment is reasonableness, *see King*, 563 U.S. at 459, and "a warrantless search of a home is presumptively unreasonable," *Martin v. State*, 620 S.W.3d 749, 759 (Tex. Crim. App. 2021).[4]   A home's curtilage—"the area immediately surrounding and associated with the home"—is "part of the home itself for Fourth Amendment purposes." *Collins v. Virginia*, 584 U.S. 586, 592 (2018) (internal quotation marks omitted).  The parties agree that Kaatz's backyard was included within his house's curtilage.

"A protective sweep is an exception to the warrant requirement." *State v. Watson*, 630 S.W.3d 451, 457 (Tex. App.—Eastland 2021, no pet.).  The United States Supreme Court has defined a protective sweep as "a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others," which is "narrowly confined to a cursory visual inspection of those places in which a person might be hiding." *Buie*, 494 U.S. at 327.  In *Buie*, the Court established a test for determining the constitutionality of a protective sweep:

> The Fourth Amendment permits a properly limited protective sweep in conjunction with an in-home arrest when the searching officer possesses a reasonable belief based on specific and articulable facts that the area to be swept harbors an individual posing a danger to those on the arrest scene.

*Id.* at 335–37.  The Court also concluded that

> such a protective sweep, aimed at protecting the arresting officers, if justified by the circumstances, is nevertheless not a full search of the premises, but may

---

[4]   Article 1, section 9 of the Texas Constitution, conversely, "contains no requirement that a seizure or search be authorized by a warrant." *Hulit v. State*, 982 S.W.2d 431, 436 (Tex. Crim. App. 1998).

11

extend only to a cursory inspection of those spaces where a person may be found. The sweep lasts no longer than is necessary to dispel the reasonable suspicion of danger and in any event no longer than it takes to complete the arrest and depart the premises.

*Id.* at 335–36.

The Texas Court of Criminal Appeals adopted the test articulated in *Buie* in *Reasor v. State*. *See* 12 S.W.3d 813, 816–17 (Tex. Crim. App. 2000). Although neither the Court of Criminal Appeals nor this Court has expressly adopted the five requirements articulated in *Gould*, we need not make such a determination in this case because the requirements that Kaatz claims were violated are encompassed in the *Buie* test.[5]

While *Buie* and *Reasor* addressed protective sweeps in the context of an in-home arrest, a number of courts have since concluded that "arrest is not always, or *per se*, an indispensable element of an in-home protective sweep[] and that although arrest may be highly relevant, particularly as tending to show the requisite potential of danger to the officers, that danger may also be established by other circumstances." *Gould*, 364 F.3d at 584 (providing in-depth analysis and listing cases); *see also, e.g.*, *United States v. Miller*, 430 F.3d 93, 100 (2d

---

[5] As listed by our sister court, which has adopted *Gould*, the requirements for a valid in-home protective sweep are:

(1) police must have entered or remained in the home legally; (2) police presence in the home must be for valid law enforcement purposes; (3) the sweep must be supported by a "reasonable, articulable suspicion" that the area harbors an individual who poses a danger to those on the scene; (4) the sweep may be no more than a "cursory inspection" of that area where such an individual may be found; and (5) the sweep may last only long enough to dispel the reasonable suspicion of danger and may not last longer than the police are justified in remaining on the premises.

*Cooksey v. State*, 350 S.W.3d 177, 185–86 (Tex. App.—San Antonio 2011, no pet.) (citing *United States v. Gould*, 364 F.3d 578, 586–87 (5th Cir. 2004) (en banc), *abrogated on other grounds by Kentucky v. King*, 563 U.S. 452, 464 (2011)).

Cir. 2005); *State v. Watson*, 630 S.W.3d 451, 457 n.2 (Tex. App.—Eastland 2021, no pet.); *Cooksey v. State*, 350 S.W.3d 177, 185 (Tex. App.—San Antonio 2011, no pet.); *cf. United States v. Waldner*, 425 F.3d 514, 517 (8th Cir. 2005) ("Other circuits have applied *Buie* to non-arrest situations but only under the second prong of *Buie*, which requires a showing of a reasonable suspicion of dangerous individuals in the house."). *But see United States v. Walker*, 474 F.3d 1249, 1254 (10th Cir. 2007) ("This court has stated that a 'protective sweep' of a residence to ensure officer safety may take place only incident to an arrest."). Because Kaatz does not argue that the search of his backyard, which was not conducted incident to an arrest, was illegal for that reason, we will assume without deciding that the *Buie* test extends to protective sweeps that are not made incident to arrests.

### A.     Area Searched

Citing *Buie*'s warning that a protective sweep is "not a full search of the premises," Kaatz argues that the front HRT did not need to enter the backyard because the back HRT had already performed a "cursory inspection" and cleared the yard. *See* 494 U.S. at 335. He asserts that "[t]he end result was that the invasion of the backyard by the first 'hasty react' team was not a 'cursory inspection' but was an illegal warrantless search."

Kaatz notably truncates the full limitation on the scope of searches set forth in *Buie*, which stated that "a protective sweep, aimed at protecting the arresting officers, if justified by the circumstances, is nevertheless *not a full search of the premises, but may extend only to a cursory inspection of those spaces where a person may be found*." *Id*. (emphasis added). A protective sweep is permissible under the Fourth Amendment if the searching officer "possesses an objectively reasonable belief, based on specific and articulable facts, that a person in that area

13

poses a danger to that police officer or to other people in the area." *Reasor*, 12 S.W.3d at 817; *see Buie*, 494 U.S. at 337. A warrant is not required if officers look only in "those places in which a person might be hiding," *Buie*, 494 U.S. at 327, or "*in areas from which an attack could be immediately launched*," *Reasor*, 12 S.W.3d at 816 (citing *Buie*, 494 U.S. at 334).

Police were dispatched to Kaatz's house to investigate a report that a body had been buried in his backyard. Prior to searching the backyard, officers received credible information that Kinslow had been arrested several times, had two outstanding warrants for aggravated assault with a deadly weapon against Cardenas, was the subject of an emergency protective order in her favor, had recently assaulted her at the house, had cut off his GPS monitor, was known "to have a lot of guns," was affiliated with the Aryan Brotherhood, and was a known user of methamphetamine. Officers had detected a possible heat signature in the backyard, and Cardenas—whose demeanor was erratic—stated that Kinslow had been at the house previously but had likely fled to Mexico. Thus, as Detective Chavez testified:

> there were several scenarios we had to consider, not just what the 911 caller said but the possibility that Nicklas Kinslow, which was our victim in this case, the fact that he was still alive, the fact that he was wanted, on the run, and possibly armed and dangerous and an escape risk.

Officer Giglio testified that she "had some concern as to officer safety and certainly would have had concern if Mr. Kinslow had been alive [and on] the premises." She testified that it would have been negligent for officers not to sweep the backyard; that the plan was "to be armed and just be prepared for anything"; and that she did not know if they would find a body or "a wanted fugitive, who's known to have guns, who could be hiding in the backyard." Corporal Jones similarly testified that his "idea going into this" was that sweeping

14

officers might encounter "either a potential fugitive that's known to have guns" or "potentially a body buried in the backyard."

The backyard was "fairly big," and the carport was more than 100 feet from the shed. Corporal Jones testified that the yard contained a number of "potential places for an assailant to hide," including a boat, shed, trailer, and truck. Although the back HRT radioed that they had "a good view" of Kaatz's backyard and at one point reported, "Clear. Still the same," officers repeatedly stated they had poor visibility and could see little. Members of the back HRT variously stated: "Backyard seems clear, but I can't see anything right there"; "[T]here's only one red light in the back, but I can't see shit"; [T]here should be some type of opening. I want to shine my light"; and "Letting you know I don't have any line of fire right now." When asked if he could see certain items in the backyard, an officer replied, "It's dark. I don't want to shine my light unless you are okay with it." In response, the officer was told to wait until the front HRT made contact with Kaatz and Cardenas. Even after turning their flashlights on, it is doubtful that the back HRT would have been able to visualize the full backyard or clear the inside of the truck and boat. Indeed, from body-camera video, it appears that the team could see only two sides of the shed.

Because the record, when viewed in a light most favorable to the trial court's ruling, shows that officers had a reasonable belief based on specific and articulable facts that a dangerous individual may have been in the backyard, we conclude that their protective sweep of the backyard was permissible under the Fourth Amendment.

15

## B.    Duration of Protective Sweep

Kaatz also argues that the front HRT violated his Fourth Amendment rights by remaining in the backyard after completing the protective sweep to await written consent to search. We agree.

A protective sweep is a quick and limited search that "must stay within the appropriate scope," *id.* at 817, and "lasts no longer than is necessary to dispel the reasonable suspicion of danger . . . and depart the premises," *Buie*, 494 U.S. at 335–36. "It is narrowly confined to a cursory visual inspection of those places in which a person might be hiding." *Id.* at 327.

Viewing the record under the relevant standard of review, the protective sweep of the backyard was completed at the latest by approximately 1:18 a.m., when Corporal Jones stated, "Good on confederate part." However, officers remained in the backyard while waiting for written consent to conduct a fuller search. During the approximately seven-minute wait, officers searched the yard with flashlights, and Detective Chavez took photographs of the cinderblock structure, which he described as a "makeshift type of grave." He determined that the cinderblocks had been "fused . . . together" and, seemingly for the first time, discovered evidence that someone had attempted to dig holes in the ground near the structure.

When officers finished the protective sweep, they lost the legal justification for their warrantless intrusion into Kaatz's backyard. At that time, they should have left the premises until they either obtained consent or a search warrant. By continuing to search, they exceeded the permissible scope of a protective sweep under the Fourth Amendment. *Id.* at 327, 335–36; *Reasor*, 12 S.W.3d at 817.

16

## C.      Residual Probable Cause

"Where a probable-cause affidavit is determined to contain illegally-obtained information, the proper course is to excise the tainted information and examine whether the remaining information still establishes probable cause." *Martin v. State*, 620 S.W.3d 749, 763 (Tex. Crim. App. 2021). While the ordinary standard for probable cause still applies under such circumstances, we no longer defer to the magistrate's conclusion regarding the adequacy of the search-warrant affidavit. *Id.* at 764 (citing *Hyland v. State*, 574 S.W.3d 904, 913 (Tex. Crim. App. 2019)); *cf. Patterson v. State*, 663 S.W.3d 155, 158–59 (Tex. Crim. App. 2022) (explaining that generally "the reviewing court should regard the magistrate's decision to issue the warrant with great deference"). Thus, "we conduct a non-deferential review to evaluate whether, after excising the allegedly tainted observations from the affidavit, the remaining facts nevertheless give rise to a fair probability that evidence of criminal activity would be found at a specified location." *Martin*, 620 S.W.3d at 764 (citing *State v. Le*, 463 S.W.3d 872, 878 (Tex. Crim. App. 2015)). "It is a flexible, non-demanding standard," and we interpret the affidavit not in a "hyper-technical manner" but rather "in a commonsensical and realistic manner, drawing reasonable inferences from the information." *Le*, 463 S.W.3d at 877–78.

As charged in this case, a person commits the offense of tampering with a human corpse if (1) knowing that an offense was committed, (2) he alters, destroys, or conceals a human corpse, (3) with the intent to impair its availability as evidence in any subsequent investigation of or official proceeding related to the offense. *See* Tex. Penal Code § 37.09(d)(1); *Stahmann v. State*, 602 S.W.3d 573, 576 (Tex. Crim. App. 2020). The underlying offense need not have been committed by the person who tampers with the corpse. *See Stahmann v. State*, 548 S.W.3d 46, 63 (Tex. App.—Corpus Christi–Edinburg 2018), *aff'd*, 602 S.W.3d 573 (Tex. Crim. App. 2020).

17

Moreover, "that the underlying offense may be justified is of no consequence in determining whether a defendant had knowledge of its commission." *Barron v. State*, 629 S.W.3d 557, 564 (Tex. App.—Eastland 2021, pet. ref'd).

Excised of all facts derived from the illegal search of Kaatz's backyard following the completion of the protective sweep, Detective Chavez's search-warrant affidavit is still sufficient to establish probable cause. Much of the information in the affidavit was learned from the 911 caller, a citizen-informant who identified herself and provided officers with her contact information. *See Illinois v. Gates*, 462 U.S. 213, 233–34 (1983) ("[I]f an unquestionably honest citizen comes forward with a report of criminal activity—which if fabricated would subject him to criminal liability—we have found rigorous scrutiny of the basis of his knowledge unnecessary."); *Le*, 463 S.W.3d at 878 ("A citizen-informer is presumed to speak honestly and accurately."); *State v. Duarte*, 389 S.W.3d 349, 357 (Tex. Crim. App. 2012) ("Citizen informants are considered inherently reliable.").

The caller reported that she had visited Cardenas at Kaatz's house on August 18, 2020; that Cardenas's ex-boyfriend, Kinslow, was buried in the backyard; and that a man who was with Cardenas had stated that "it happened" in the house, had pointed out drag marks where Kinslow was removed from the house, and had told the caller that the marks had been bleached. When Officer Allen called the citizen-informant, she informed him that Kinslow had been abusive toward Cardenas, that Cardenas had stated that she paid for Kinslow's release from jail and that he assaulted her after being released, and that Cardenas had shown the caller where Kinslow was buried: "a concrete mass in the shape of the body . . . surrounded by cinder[]blocks."

18

Police corroborated many of the details given by the caller. *See Gates*, 462 U.S. at 241 ("Our decisions . . . have consistently recognized the value of corroboration of details of an informant's tip by independent police work."). Detective Chavez discovered that Kinslow had an outstanding warrant for aggravated assault with a deadly weapon and learned from Kinslow's father that Kinslow had earlier removed his GPS monitor and fled. At approximately 1 a.m. on August 19, police contacted Cardenas and Kaatz at his house. Kaatz confirmed that after being released from jail, Kinslow had abused Cardenas at the house. Prior to the conclusion of the protective sweep at 1:18 a.m., Detective Chavez observed in Kaatz's backyard cinderblocks "in the shape of a rectangle . . . consistent with the length and width of a human body" and smelled "a distinct odor" that was "consistent with a decomposing body and/or other organic matter." He also observed "two large bags of 'Quikrete' High Strength Concrete Mix leaning against a red industrial-sized dolly."[6]

We conclude that the facts in the affidavit, purged of illegally obtained information, are adequate to support a finding of probable cause and issuance of the search warrant. *See Martin*, 620 S.W.3d at 766–67; *Le*, 463 S.W.3d at 877 ("A search warrant based in part on tainted information is nonetheless valid if it clearly could have been issued on the basis of the untainted information in the affidavit."). Neither the Fourth Amendment exclusionary rule nor article 38.23(a) of the Code of Criminal Procedure "requires the suppression of evidence that was not 'obtained' as a result of some illegality." *State v. Jackson*, 464 S.W.3d 724, 731 (Tex.

---

[6] Detective Chavez's body-cam video shows that he observed the cinderblock structure and cement bags before the end of the protective sweep. Chavez entered the backyard at approximately 1:16 a.m., agreed that he could smell something near the shed and cinderblock structure, and stated at approximately 1:17 a.m., "But there's fresh concrete, bags."

Crim. App. 2015).[7] Thus, the trial court did not abuse its discretion by denying Kaatz's motion to suppress. We overrule Kaatz's first issue.

## II. *Franks* Hearing

In his second issue, Katz contends that the trial court abused its discretion by denying his motion for a *Franks* hearing and by failing to suppress all evidence obtained as a result of the search warrant. *See* 438 U.S. at 155–56. He argues that had the trial court held a hearing,

> it would have been easily established by a preponderance of the evidence that Detective Chavez either knowingly or intentionally made numerous false statements or engaged in a reckless disregard for the truth when he drafted the affidavit for the search warrant. It would also have been shown at the hearing that when those false statements were set aside, the remaining material contained in Detective Chavez's affidavit w[as] insufficient to establish probable cause to support a search of appellant's home and backyard.

In his motion, Kaatz listed 17 "main points" that he claimed were omitted from Detective Chavez's affidavit. In substance, the points amount to a more detailed description of the investigative steps that were or were not taken by officers as well as a timeline of when specific facts were learned. Kaatz also alleged that Detective Chavez "deliberately made several false statements in Paragraphs 9, 10[,] and 11 [of the affidavit] or made these statements with reckless disregard for the truth." Specifically, Kaatz asserted that "Detective Chavez lied in his affidavit when he wrote his affidavit in such a way to make the magistrate believe that it was after the Defendant gave written consent to search the premises that the officers discovered the area covered in plywood and smelled the odor of decomposition."

---

[7] Because we conclude that police searched Kaatz's backyard pursuant to a valid search warrant, we need not decide whether Kaatz's written consent to search the backyard was voluntary and untainted by illegal conduct.

In *Franks*, the United States Supreme Court held that "defendants may attack 'the truthfulness of factual statements made in a search warrant affidavit.'" *Diez v. State*, 693 S.W.3d 899, 917 (Tex. App.—Austin 2024, pet. filed) (quoting *Diaz v. State*, 632 S.W.3d 889, 892 (Tex. Crim. App. 2021)); *see Franks*, 438 U.S. at 171–72. "Such a challenge requires the defendant 'to show by a preponderance of the evidence a material misstatement that was made intentionally or knowingly or with reckless disregard for the truth.'" *Diez*, 693 S.W.3d at 917 (quoting *Diaz*, 632 S.W.3d at 892). "A false statement is material if it 'is necessary to the finding of probable cause.'" *Id.* (quoting *Diaz*, 632 S.W.3d at 892); *see Franks*, 438 U.S. at 156.

"To mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine." *Franks*, 438 U.S. at 171. He must "point out specifically the portion of the warrant affidavit that is claimed to be false" and provide "a statement of supporting reasons." *Id.* "Allegations of negligence or innocent mistake are insufficient." *Id.* In making a showing of falsity, the defendant is not limited to the four corners of the affidavit. *Cates v. State*, 120 S.W.3d 352, 355 n.3 (Tex. Crim. App. 2003). If the defendant makes the necessary showing of a materially false statement but, when that statement is set aside, the affidavit's remaining content is sufficient to support a finding of probable cause, no hearing is required. *See Franks*, 438 U.S. at 171–72; *Diaz*, 632 S.W.3d at 893. "We review the trial court's ruling on a *Franks* issue under the same standard applied to search and seizure issues generally." *Emack v. State*, 354 S.W.3d 828, 838 (Tex. App.—Austin 2011, no pet.). "[W]e give almost total deference to the court's rulings on questions of historical fact and mixed questions of law and fact that turn on an evaluation of credibility and demeanor, but we review de novo the trial court's application of the law to those facts." *Id.*

21

While the United States Supreme Court has been silent on the matter, the Court of Criminal Appeals has assumed that *Franks* applies to material omissions but has not "decided the issue." *Diaz*, 632 S.W.3d at 892 (citing *Renteria v. State*, 206 S.W.3d 689, 704 (Tex. Crim. App. 2006)). We have likewise stated that we "continue to leave the question open." *Diez*, 693 S.W.3d at 917; *cf. Emack*, 354 S.W.3d at 837–38 (noting that "[b]y its express terms, the holding in *Franks* applies only to affirmative misstatements" but assuming without deciding that *Franks* applies to omissions of fact); *Auld v. State*, 673 S.W.3d 267, 272 (Tex. App.—San Antonio 2023, pet. ref'd) (applying *Franks* to material omissions). For purposes of this opinion, we assume without deciding that *Franks* extends to material omissions.

As we have already concluded that Detective Chavez's excised affidavit was sufficient to establish probable cause, the 17 omissions identified by Kaatz are not material. *See Diez*, 693 S.W.3d at 917.

In paragraphs 9 through 11 of the affidavit,[8] Detective Chavez attested:

> Corporal Michael Jones #6786 obtained written consent from Walker Kaatz to search his residence.
>
> Affiant walked to the backyard of [Kaatz's house] and observed cinder blocks in the shape of a rectangle. The size of the rectangular shape was consistent with the length and width of a human corpse. The cinder blocks surrounded a concrete mass, which was raised above the ground with similar a lump to the size of a human body. Your affiant also observed a large bottle of lighter fluid on top of a cinder block and a pile of unknown burnt substance on top of the concrete mass. An accurate depiction of the concrete mass is shown in the following two photographs:
>
> [photographs omitted]

---

[8] The paragraph numbers are Kaatz's and appear to begin following the fifth section of Detective Chavez's affidavit ("5. Affiant has probable cause for said belief by reason of the following facts"), which Kaatz attached to his motion as an exhibit.

Affiant detected a distinct odor originating from the concrete mass. The odor had characteristics [that were] consistent with a decomposing body and/or other organic matter. Affiant also observed two large holes in the ground beside the concrete mass, along with tools commonly used to dig holes in the ground nearby. These tools included a shovel leaning against the structure of the residence and two hoes, which were leaning against a shed in the backyard. Affiant also observed two large bags of "Quikrete" High Strength Concrete Mix lea[]ning against a red industrial-sized dolly. These items were within a few feet from the concrete mass.

Kaatz does not allege that the paragraphs' contents are false but rather that the affidavit's structure leaves a false impression. He asserts that Detective Chavez "failed to include the fact that prior to Corporal Jones obtaining the written consent of appellant to search the residence, officers engaged in an illegal protective sweep of appellant's house and backyard." Kaatz argues that the paragraphs are structured "in such a way to make the magistrate believe that it was <u>after</u> appellant gave written consent to search the premises that the officers discovered the area covered in plywood and smelled the odor of decomposition."

*Franks* concerns "the truthfulness of *factual statements* made in a search warrant affidavit" and does not mandate that an affiant offer legal conclusions. *See Diaz*, 632 S.W.3d at 892 (emphasis added). Moreover, because Kaatz does not claim that the facts sworn to in these paragraphs are false, and no evidence shows them to be false, they cannot support his *Franks* claim. *See id.* The Court of Criminal Appeals has previously rejected at least one such challenge based on an implication created by an affidavit's structure. *See id.* (rejecting claim "that Statement B was camouflage for statement C").

Although Kaatz argues that the Court of Criminal Appeals' reasoning in *Cates* can be applied in the present case, that case is distinguishable. *See* 120 S.W.3d at 357–59. *Cates* concerned factual statements made by an officer in a search warrant affidavit regarding a

23

confidential informant (CI) whom the officer attested had told him about drugs that the CI had seen in Cates's home.  *Id.* at 354.  The officer swore that the CI:

> (1) had provided credible information in the past; (2) was lawfully employed in the community; (3) had admitted his/her own prior drug use but now does not condone the use of drugs; and (4) had been at the home of Willie and Donnie Hope within the 72 hours preceding the affidavit and observed both of them in possession of methamphetamine.

*Id.*

In his motion to suppress, Cates alleged that the officer's description of the CI contained deliberate falsehoods because Cates himself had complained to the officer and had not mentioned the presence of drugs.  *Id.*  He also alleged that "no adult person engaged in a lawful occupation" had entered his home within 72 hours of the making of the affidavit and that there could not have therefore been a CI in his home "such as [wa]s described in the affidavit."  *Id.* at 358.  The Court found that Cates had made a substantial preliminary showing of falsity in the affidavit.  *Id.* at 359.

By contrast, Kaatz claims that Detective Chavez omitted information from the affidavit and that the affidavit's structure is misleading.  He does not offer proof that any factual assertion made in the affidavit was deliberately false or made with reckless disregard for the truth.  *See Franks*, 438 U.S. at 171 (holding that *Franks* violation depends on evidence of falsity and that burden rests on defense to produce it).

For these reasons, we conclude that the trial court did not abuse its discretion by denying Kaatz's motion for a *Franks* hearing or by failing to suppress all evidence obtained as a result of the warrant.  We overrule Kaatz's second issue.

## CONCLUSION

Having overruled both of Kaatz's issues, we affirm the trial court's judgment of conviction.

_____

Edward Smith, Justice

Before Justices Baker, Triana, and Smith

Affirmed

Filed:   September 27, 2024

Do Not Publish